James A. EDWARDS,
Petitioner-Appellant,

v.

UNITED STATES of America,
Respondent-Appellee.

No. 86–2243.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 23, 1987.

Decided March 23, 1987.

Scott L. King, King & Meyer, Gary, Ind., for petitioner-appellant.

Kevin E. Milner, Asst. U.S. Atty., Hammond, Ind., for respondent-appellee.

Before CUMMINGS and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

Edwards received concurrent prison sentences of five years for having violated 18 U.S.C. § 495 by (1) forging an endorsement on a United States Treasury check for $437 and then (2) uttering the check (i.e., using it as a medium of payment). Later he brought this action under 28 U.S.C. § 2255 to set aside his sentences on the ground that a statute passed shortly before he was sentenced, 18 U.S.C. § 510, had impliedly repealed section 495 with respect to Treasury checks for less than $500. We agree with the district court, 646 F.Supp. 42 (1986), and with the Ninth Circuit in *United States v. Edmonson*, 792 F.2d 1492, 1497–98 (9th Cir.1986), that there was no repeal. See also *United States v. Jackson*, 805 F.2d 457 (2d Cir.1986), which rejected a similar argument (that section 510 had repealed section 641 of the Criminal Code, which forbids the conversion of money or other things of value of the United States).

Section 495, under which Edwards was sentenced, reads as follows:

Whoever falsely makes, alters, forges, or counterfeits any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving, or of enabling any other person, either directly or indirectly, to obtain or receive from the United States or any officers or agents thereof, any sum of money; or

Whoever utters or publishes as true any such false, forged, altered, or counterfeited writing, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited; or

Whoever transmits to, or presents at any office or officer of the United States, any such writing in support of, or in relation to, any account or claim, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited—Shall be fined not more than $1,000 or imprisoned not more than ten years, or both.

The source of this statute is the Act of March 3, 1823, ch. 38, § 1, 3 Stat. 771, which specified a maximum sentence of 10 years at hard labor. Later versions made slight wording changes, and eventually the provision for hard labor was dropped; but the consistency in both the substantive and the penalty provisions through revisions of the federal criminal code extending over a century and a half is impressive. See Rev. Stat. § 5421 (1873); Crim.Code § 29, 35 Stat. 1088, 1094 (1909); 18 U.S.C. § 73 (1940); 18 U.S.C. § 495 (1948).

Section 510 was passed in 1983. It provides:

(a) Whoever, with intent to defraud—

(1) falsely makes or forges any endorsement or signature on a Treasury check or bond or security of the United States; or

(2) passes, utters, or publishes, or attempts to pass, utter, or publish, any Treasury check or bond or security of the United States bearing a falsely made or forged endorsement or signature shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

(b) Whoever, with knowledge that such Treasury check or bond or security of the United States is stolen or bears a falsely made or forged endorsement or signature buys, sells, exchanges, receives, delivers, retains, or conceals any such Treasury check or bond or security of the United States that in fact is stolen or bears a forged or falsely made endorsement or signature shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

(c) If the face value of the Treasury check or bond or security of the United States or the aggregate face value, if more than one Treasury check or bond or security of the United States, does not exceed $500, in any of the above-mentioned offenses, the penalty shall be a fine of not more than $1,000 or imprisonment for not more than one year, or both.

Had Edwards been prosecuted under section 510 rather than section 495, as well he might have been since his conduct violates both sections, he could not have been given a prison sentence of more than a year; for section 510(c) makes the forging, etc. of a Treasury check for $500 or less a misdemeanor, rather than the felony it is under section 495.

Section 495 is an old statute that deals very broadly with fraud against the United States by forgery or counterfeiting; section 510 is a recent statute that deals specifically with forged signatures and endorsements on Treasury checks—and Edwards' crimes were forging an endorsement on a Treasury check and then uttering the check. Edwards argues from these two points that section 510 supplants, and must therefore be taken to have implicitly repealed, section 495 so far as his conduct is concerned.

■ The government by way of counterargument lays heavy stress on the maxim of statutory interpretation that "repeals by implication are not favored." *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). Like so many such maxims (the "canons of construction" as they are grandly called), however, this one rests on an unrealistic premise about the legislative process. The premise is that when a legislature contemplates passing a new statute it is careful to search the statute book for any statute that might overlap the new one, and if it finds any such older statute *and* doesn't want to continue that statute in force it repeals it explicitly when passing the new one. "The presumption against implied repeals is founded upon the doctrine that the legislature is presumed to envision the whole body of the law when it enacts new legislation." 1A Sutherland Statutory Construction § 23.10, at p. 346 (4th ed. 1985). But, of course, neither Congress nor any other legislature in the United States "envision[s] the whole body of the law when it enacts new legislation." Cf. *Barrett v. United States,* 423 U.S. 212, 223–24, 96 S.Ct. 498, 504–05, 46 L.Ed.2d 450 (1976). How could it, given the vast expanse of legislation that has never been repealed and the even vaster expanse of judicial and administrative rulings glossing that legislation? Another objection to invoking the maxim is that the system of interpretive maxims provides no weighting of conflicting ones, which here as almost always are in play (see Llewellyn, The Common Law Tradition: Deciding Appeals 521–35 (1960)): against the maxim that implied repeals are disfavored can be set the maxim that ambiguities in criminal statutes should be resolved in favor of lenity even when the only issue is the length of sentence, see, e.g., *Simpson v. United States,* 435 U.S. 6, 14–15, 98 S.Ct. 909, 913–14, 55 L.Ed.2d 70 (1978).

Judge (now Justice) Scalia has offered a fresh defense of the maxim:

Without it, determining the effect of a bill upon the body of preexisting law would be inordinately difficult, and the legislative process would become distorted by a sort of blind gamesmanship, in which Members of Congress vote for or against a particular measure according to their varying estimations of whether its implications will be held to suspend the effects of an earlier law that they favor or oppose.

*United States v. Hansen,* 772 F.2d 940, 944 (D.C.Cir.1985). But the problem of "blind gamesmanship" exists even if the maxim is steadfastly adhered to. Legislators voting on a bill under such a regime will have varying estimations about the impact on the bill (if it is enacted) of existing statutes which they favor or oppose. And all this assumes that the legislators know the existing statutory terrain well. What is more likely is that forgotten statutes lurking in the statute book, plus remembered statutes that have acquired nonobvious meanings through a process of judicial or regulatory interpretation, will make the body of unrepealed statutes a minefield for the new law.

■ Our opinion of the maxim can have little weight, however, when we reflect how vigorously the modern Supreme Court enforces it in the case of overlapping criminal statutes—which is this case. In *United*

*States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), the Supreme Court unanimously reversed a decision by this court, and, relying in part on the maxim against implied repeal, held that two overlapping provisions of the Criminal Code were both enforceable. Although the provisions were different from those in this case, *Batchelder* expresses a mood that we are not free to ignore.

It can also be argued that, whatever the objections to the maxim in other cases, it makes some sense in the present case because its application need not rest on an assumption that Congress carefully combed the statute book before enacting the new legislation. The legislative history of section 510 indicates that it was intended to plug a loophole in section 495. So, obviously, Congress was aware if not of "the whole body of the law" then at least of the body of law relevant to the new statute. The problem is that the maxim presumes not only legislative omniscience, but also a legislative preference for the earlier over the later statute to the extent that the two are inconsistent but not utterly incompatible in the sense of requiring inconsistent conduct. "[T]he drafters should expressly designate the offending provisions rather than leave the repeal to arise by implication from the later enactment." 1A Sutherland Statutory Construction, *supra,* § 23.10, at p. 346 (footnote omitted). But what if the legislature doesn't do what *Sutherland on Statutory Construction* tells it it should do?

 The two statutes at issue in this case do not require inconsistent conduct, as they would if section 510 provided that the maximum sentence for a violation of section 495 was five rather than ten years—a case of "positive repugnancy" as the cases quaintly put it, see, e.g., *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 1993–94, 48 L.Ed.2d 540 (1976). But they rest on seemingly inconsistent premises: that forging an endorsement on a U.S. Treasury check for less than $500 is and is not a sufficiently grave form of misconduct to warrant punishment as a felony. It seems arbitrary to assume that

the first premise, which is found in a statute that dates back to 1823, expresses a more authentic, deliberative legislative view than the second, which is found in a statute enacted only four years ago. A more searching inquiry into legislative purpose is required than the maxim against implied repeals invites.

The loophole that Congress sought to plug by section 510 is the following: if a thief stole a Treasury check that had been endorsed by the payee, and then endorsed his own name and cashed the check, there would be no violation of section 495; likewise if he stole the check and simply sold it to someone else, without endorsing it. See S.Rep. No. 225, 98th Cong., 1st Sess. 371–72 (1983). Section 510(b) plugs this gap. See *id.* at 372; *United States v. Fields,* 783 F.2d 1382, 1384–85 (9th Cir.1986). Section 510(a), however, in punishing the forging of a signature or endorsement on a Treasury check and the uttering of the check, traverses ground already covered, though less explicitly, by section 495. Although that section makes no explicit reference to endorsements, the words "other writing" have been interpreted to cover them. *Prussian v. United States,* 282 U.S. 675, 679, 51 S.Ct. 223, 225, 75 L.Ed. 610 (1931).

Since Congress was aware of section 495 when it passed section 510, one can argue that if it had wanted to repeal so much of section 495 as overlapped with section 510(c) (making the offenses in 510(a) and (b) misdemeanors if the check or checks had a face value of $500 or less) it would have done so, to spare us this appeal. But one can also argue, as Edwards does, that knowing that some conduct within the scope of section 510 had been made felonious by section 495 through judicial interpretation (and Congress did know, as we shall see), Congress decided that such conduct should only be a misdemeanor. This is unlikely however. The only purpose revealed by the legislative history of section 510 is to close a loophole in section 495. There is no suggestion in the legislative history, or in the mood of Congress in the 1980s, that another purpose was to lighten the maximum punishment for conduct already punishable under section 495. No

one said anything like, "Gee, ten years is a long sentence for uttering a forged check for $2." It is true that section 510(c) steps certain offenses made felonies by the preceding two subsections down to misdemeanors, but the reason is apparent when one recalls that the primary purpose of section 510 was to prohibit transactions in stolen (but not necessarily forged or falsely endorsed) Treasury checks. The law has always distinguished between grand and petty larceny.

█ One might think that if Congress had wanted merely to expand liability (as we think it did), it would have confined the misdemeanor provision to subsection (b), and made (a), the part that overlaps with section 495, always a felony. But, surprising as it may seem, creating a statutory system in which the government has the choice between charging the same conduct as a felony or as a misdemeanor helps prosecutors and is thus perfectly consistent with a legislative desire to expand liability. Cf. *United States v. Jackson, supra*, 805 F.2d at 463–64, affirming *United States v. Bennerson*, 616 F.Supp. 167, 176–77 (S.D.N.Y.1985). The felony statute becomes a lever that the government can use to extract a favorable plea bargain by offering to charge the defendant under the misdemeanor statute. Cf. *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). In any event it is common for the same conduct to be subject to different criminal statutes. Cf. *United States v. Anderez*, 661 F.2d 404, 407 (5th Cir.1981). For a dramatic example related to this case, compare the almost identical provisions of Rev.Stat. §§ 5418 and 5479 (1873). Congress's concern with making assurance doubly sure by redundantly prohibiting criminal conduct may be a vestige of the days when, criminal punishments being savage, judges and juries strained to find loopholes in criminal statutes. See, e.g., 4 Blackstone, Commentaries on the Laws of England 238–39 (1769).

This leaves only one question: if as appears the only purpose of section 510 was to plug the stolen-check gap, why did Congress bother with subsection (a), which du-plicates section 495? Why didn't it stop with the provisions in (b) and (c)? And if (b) is the principal novelty in the statute, why is it the second rather than the first subsection?

The likeliest explanation for the content and priority of (a) is found in a passage in the Senate Report on the 1984 overhaul of the Criminal Code, discussing the provision later enacted separately as section 510:

> With respect to the forging of endorsements on United States securities, violations involving forgery of endorsement or fraudulent negotiation of a Treasury check or bond or other security of the United States are sometimes successfully prosecuted under 18 U.S.C. 495. That statute was not, however, drafted to deal specifically with government obligations, but instead expressly covers deeds, powers of attorney, and contracts. The basis for using section 495 to prosecute violations with respect to government securities is the provision therein which punishes the forgery or alteration of "other writings".

S.Rep. No. 225, 98th Cong., 1st Sess. 371 (1983). In other words, Congress wasn't happy with the judicial patch job on section 495 and wanted to make sure it had an effective statute dealing with forgery and related misconduct pertaining specifically to federal government obligations. So section 510(a) was added to eliminate whatever doubts might attend the use of section 495 for this purpose and was put first because it designates the primary misconduct involved in forged obligations—the forgery, as distinct from the transfer of the forged obligation (which is (b)). The remark in the Senate Report about forgery and related misconduct concerning federal government obligations being "sometimes" successfully prosecuted reveals the nature of Congress's concern. There is no hint of a desire to repeal section 495 in whole or part, or to reduce the severity of punishment under it.

AFFIRMED.

CUMMINGS, Circuit Judge, concurring.

To my mind, this Court rightly decided *United States v. Batchelder*, 581 F.2d 626

(1978). Both panel rehearing and rehearing *en banc* were denied. *Idem.* Nevertheless, since the Supreme Court reversed (442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755), it is incumbent upon me to concur in the present opinion.