**HUNTINGTON BRANCH NAACP, et al., Plaintiffs,**

v.

**The TOWN OF HUNTINGTON, et al., Defendants.**

**No. CV–81–0541.**

United States District Court, E.D. New York.

Oct. 23, 1990.

See also, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180.

Richard F. Bellman, Steel & Bellman, New York City, for plaintiffs.

Richard C. Cahn, Cahn, Wishod & Wishod, Melville, N.Y., for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

The plaintiffs moved this court pursuant to 42 U.S.C. § 3613(c)(2) for an order awarding them costs and attorneys' fees.

This action was commenced by the filing of a complaint on February 23, 1981 alleging that the defendants violated the plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3601–3619 (Title VIII of the Civil Rights Act) by applying their zoning regulations to restrict private multi-family housing projects to an urban renewal area populated predominantly by minorities. The plaintiffs sought to enjoin that application of the defendants' zoning regulations and to recover damages. Several months after the complaint was filed, a motion to dismiss the complaint was filed by the defendants. That motion was granted upon the ground that the plaintiffs did not have standing to sue. The plaintiffs appealed that determination and on September 28, 1982 the United States Court of Appeals for the Second Circuit reversed and remanded the case to this court. The defendants petitioned the United States Supreme Court for a writ of certiorari which was denied.

The plaintiffs then moved for the certification of a class which was granted in 1983. Extensive discovery then ensued and in May 1984 a motion to dismiss and/or for summary judgment was filed by the defendants. That motion was denied, as were subsequent motions to reargue. Preparation for trial proceeded apace. Requests for admissions were exchanged, a pretrial order drafted and trial memoranda written. The trial occupied several weeks and over the month that followed closing statements were heard and proposed findings of fact, conclusions of law and post-trial briefs were filed. The judgment rendered by this court in the defendants' favor was later reversed by the United States Court of Appeals and, as directed by that court, judgment was entered for the plaintiffs. The defendants sought review of the Court of Appeals decision in the United States Supreme Court which summarily affirmed the decision.

Subsequent proceedings were conducted by this court in which the parties were heard regarding the terms of the final judgment eventually entered and briefs submitted in that regard were considered. This summary narrative of the history of the case is designed to place in proper perspective the extensive proceedings culminating in this application for an award of attorneys' fees.

Defendants do not seriously dispute plaintiffs' entitlement to costs and fees; rather, they dispute the amounts claimed by plaintiffs. Plaintiffs seek an award of

$1,142,237.10. For the reasons stated below, the court grants plaintiffs' application for costs and fees, but in an amount reduced from that sought.

There are four issues to be decided in considering this fee application:

1. What "lodestar" fee are plaintiffs' attorneys entitled to? This encompasses both the question of what rate is "reasonable" and whether there exist grounds to "enhance" that reasonable fee, as asserted by plaintiffs.

2. How many hours will the court approve as "reasonable"?

3. What "multiplier" is appropriate?

4. Should plaintiffs' application for expert witness fees be allowed?

I. *Lodestar*

What fee is reasonable is determined by "the prevailing market rates in the relevant community" for "similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895–96 & n. 11, 104 S.Ct. 1541, 1547–48 & n. 11, 79 L.Ed.2d 891 (1984). The Second Circuit has stated that the "relevant community" is the district in which the district court sits, unless a showing is made that special expertise of counsel from a distant district was required. *Polk v. New York State Dep't of Correctional Servs.*, 722 F.2d 23, 25 (2d Cir.1983). Both sides agree that the "market" involved is the market for counsel in civil rights cases. Thus, this court must determine what the market rate is for lawyers with the skill and experience of plaintiffs' attorneys who litigate civil rights cases in the Eastern District of New York.

Plaintiffs claim that $240/hour for partners and $150/hour for associates are the current prevailing market rates. They assert by affidavit that this is what they currently charge clients in this area. Affidavits of third parties submitted by plaintiffs support these rates, or rates of $225/$135 per hour (in the case of those affidavits executed in 1988, when the first fee application was made to the Second Circuit).

In response, defendants have submitted affidavits of town attorneys in which they represent the rate they charge the various municipalities who are their clients. This information, however, has no relevance in determining the proper fee to be awarded the attorneys for the private plaintiffs in this case. Many cogent reasons could easily be listed as to why lawyers for municipalities are induced to bill those clients at lower rates than would be billed for similar services performed on behalf of private clients. Even defendants' opposition affidavits themselves assert that the affiant attorneys (including defendants' attorneys) charge lower rates to municipalities than they do to private clients. The proper rate to be awarded to plaintiffs' attorneys is not the rate customarily charged to municipalities, but a rate comparable to that charged to private clients. *Miele v. New York State Teamsters Conference on Pension & Retirement Fund*, 831 F.2d 407, 409 (2d Cir.1987).

Of some small relevance is a survey from the February 9, 1990 edition of the *Suffolk Lawyer*, submitted by defendants, which indicates that firms similar to Steel & Bellman in size generally charge between $150–$200/hour for partners and $100–$150/hour for associates, with one firm charging $250/hour and $175/hour, respectively. Plaintiffs respond by referring to a survey conducted by the Suffolk County Bar Association, which indicated that in 1988 small law firms in Suffolk County charged from $150–$250/hour for partners' time, and $100–$150/hour for associates' time. *See Palermo v. Bd. of Educ.*, No. CV–87–2960, slip. op. at 7, 1989 WL 35938 (E.D.N.Y. Apr. 3, 1989).

The other source of information on proper fees comes from the fees awarded in other, similar cases. Though plaintiffs cite several cases in which fees of $225–$250/hour have been awarded to partners, upon looking at these cases it is clear that *lead* attorneys have rarely, if ever, been awarded the level of fees plaintiffs seek. For example, in *Palermo* the court awarded $250/hour to the partners who had worked on the case, but whose total hours

equalled only 17.9. The associates who expended the remaining hours in the case, approximately 200, were awarded a rate of $125/hour.

Nevertheless, the amount awarded in those cases should not be determinative. In this case, the partners did most of the work, and performed extremely ably. It is indisputable that Mr. Steel and Mr. Bellman are quite experienced as civil rights attorneys. Ms. Clark and Ms. Novendstern, the associates, have five and nine years experience, respectively, and Ms. Clark was a clerk for the Third Circuit Court of Appeals. They are all entitled to their market rates. The amount awarded to them, however, should not be the highest rate they can earn, but such rate as will provide "reasonable payment for the time and effort expended," *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 726, 107 S.Ct. 3078, 3087, 97 L.Ed.2d 585 (1987).

Based upon all of the above, this court finds that lodestar rates of $225/hour for the time of Mr. Steel and Mr. Bellman, and $135/hour for the time of Ms. Clark and Ms. Novendstern are appropriate.

These amounts are already "enhanced," inasmuch as they are current, not historical rates. In *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989), the Supreme Court explicitly approved this kind of enhancement, as compensation for delay in payment. As to the other claims for enhancement, they are denied. Plaintiffs' claim that this was an "unpopular" case is unconvincing; the case was unpopular in the town of Huntington, perhaps, but certainly *enhanced* the popularity of plaintiffs' attorneys in the civil rights community. Also unconvincing is plaintiffs' claim of preclusion from other employment. As to the novelty and complexity of issues in the case, these are adequately reflected in the number of hours billed. *Blum v. Stenson,* 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Finally, plaintiffs seek enhancement for the contingent nature of the case. While contingency may be considered as a basis for increasing a fee

award, *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 729–31, 107 S.Ct. 3078, 3088–90, 97 L.Ed.2d 585 (1987); *Lewis v. Coughlin,* 801 F.2d 570, 576 (2d Cir.1986), this factor may be adequately addressed by means of the multiplier.

## II. *Reasonable Hours*

Defendants challenge Mr. Bellman's claimed hours as unnecessary and duplicative. This court finds no reason to dispute Mr. Bellman's sworn statements as to the time it took him to complete the various legal tasks required by this litigation. None of the hours claims are so unreasonable on their face as to be patently unallowable. On the other hand, defendants' argument that time spent being interviewed by the press and touring the Huntington minority community should not be compensated is persuasive. This reduces Mr. Bellman's time by 23 hours and 45 minutes. None of the other hours claimed are contested by defendants, and the court does not find them unreasonable, unnecessary, or duplicative. Therefore, all hours claimed by plaintiffs will be approved, after subtracting 23 hours and 45 minutes from Mr. Bellman's time.

## III. *Multiplier*

Plaintiffs seek a multiplier of 1.75. They predicate this claim upon two factors; the contingent nature of the case (i.e., the fact that plaintiffs' attorneys would not have been paid anything had they not prevailed in the case) and the quality of their representation. Defendants claim that no multiplier is warranted.

Justice O'Connor, in her concurring opinion in *Delaware Valley,* stated that risk multipliers are permissible, as long as the court does not "enhance a fee award any more than necessary to bring the fee within the range that would attract competent counsel." 483 U.S. at 733, 107 S.Ct. at 3091. In *Blum,* the Supreme Court stated that "[t]he 'quality of representation' ... generally is reflected in the reasonable hourly rate," and that an adjustment should be made for this factor "only in the

rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" 465 U.S. at 899, 104 S.Ct. at 1549.

As to risk, the general rule recognized by the most recent cases is that a multiplier of .5 to 1 is appropriate to compensate for contingency. *See McKenzie v. Kennickell,* 875 F.2d 330, 334 (D.C.Cir.1989); *Wesley v. Spear, Leads & Kellogg,* 711 F.Supp. 713, 717 (E.D.N.Y.1989). Here, plaintiffs' attorneys were paid $52,000 for the early stages of the suit. Partial payment is relevant to the risk multiplier, *McKenzie,* 875 F.2d at 334, but here the amount paid is quite small compared to the entire fee to which plaintiffs' attorneys are entitled. After receiving this partial payment, Bellman & Steel continued to litigate this case for many years without any assurance of further payment. In light of these facts, the court finds that plaintiffs' suggested 1.75 multiplier is appropriate. This forecloses any need to inquire as to whether this case would meet the strict standards of *Blum* for enhancement based on quality of representation.

### IV. *Expert Witness Fees*

■ Defendants cite *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), for the proposition that expert witness fees are not recoverable in this action. The *Crawford* Court, however, merely held that expert witness fees were not "costs" under 28 U.S.C. §§ 1920 and 1821(b), or Fed.R.Civ.P. 54(d). The decision specifically notes that the question of the recovery of expert fees under 42 U.S.C. § 1988 was not before the Court. 482 U.S. at 445, 107 S.Ct. at 2499 (Blackmun, J., concurring).

Two district courts in this circuit have analyzed *Crawford* and held that it does not preclude payment of expert witness fees under § 1988; the Second Circuit affirmed one of the decisions. *See Hillburn v. Commissioner of Connecticut Dep't of Income Maintenance,* 683 F.Supp. 23, 27 (D.Conn.1987), *aff'd,* 847 F.2d 835 (2d Cir. 1988); *United States v. Yonkers Bd. of Educ.,* 118 F.R.D. 326, 330 (S.D.N.Y.1987). Based on these cases, especially the Second Circuit's affirmance (without opinion) in *Hillburn,* it is fair to conclude that in this circuit, expert witness fees are recoverable under § 1988. The court is not unmindful of the divergent views expressed on this issue in other circuits. *West Virginia Univ. Hosps., Inc. v. Casey,* 885 F.2d 11 (3rd Cir.1989), *cert. granted,* — U.S. —, 110 S.Ct. 1294, 108 L.Ed.2d 472 (1990), represents the view that *Crawford Fitting* does reach expert fee awards under § 1988 and precludes the award of such fees in excess of $30 per day as provided in 28 U.S.C. § 1821(b).

Although recognizing that "in this age of sophisticated litigation, in which expert witnesses play an increasingly important role, thirty dollars per day is an insignificant sum," the Court went on to hold that:

> [W]e believe that we are constrained by the language of *Crawford* ... to limit expert witness fees to thirty dollars a day. Congress has chosen to legislate in this area and unless the statute under which expert witness fees are awarded expressly repeals the limits of sections 1920 and 1821(b), we must defer to legislative fiat.

885 F.2d at 34.

Perhaps the most vigorous expressions of the contrary view are to be found in the concurring opinion by Judge Rubin in *International Woodworkers v. Champion Int'l Corp.,* 790 F.2d 1174, 1181–1193 (5th Cir.1986), and in the opinion by Judge Posner in *Friedrich v. City of Chicago,* 888 F.2d 511 (7th Cir.1989). The force of the analysis reflected in those opinions, is compelling and perhaps the reference to selected excerpts from each will convincingly support that view. In *Champion,* Judge Rubin wrote:

> Although the statute explicitly refers only to the award of attorney's fees, Congress made clear that attorneys were to be paid "as is traditional with attorneys compensated by a fee-paying client." As the Act's sponsor, Representative Drinan, stated during the

House debate, "I should add that the phrase *'attorney's fee' would include ... all incidental and necessary expenses incurred in furnishing effective and competent representation.*" These remarks are consistent with the frequent observation that private enforcement of the civil rights laws depend on the citizens' "opportunity to recover what it costs them to vindicate these rights in court." To fulfill its purpose, the Act necessarily authorized reimbursement for all the resources necessary for "*effective access* to the judicial process." "Congress must insure [that civil rights litigants] have the means to go to court and *to be effective once they get there,*" because "[i]f the cost of private enforcement actions becomes too great, there will be no private enforcement." And, if prevailing plaintiffs or their attorneys must bear the burden of prohibitive expert witness fees, the civil rights laws will be enforced either less frequently or less effectively than Congress intended.

790 F.2d at 1183 (footnotes omitted).

Judge Rubin concluded by observing that:

A rule that denies a prevailing party who is entitled to attorney's fees the right to recover the other costs for which his lawyer bills him gives the vindicated party only half a victory. Although the victor in litigation is not entitled to spoils, he ought at least be able to invoke the court's discretion to make him whole.

790 F.2d at 1193.

In *Friedrich,* Judge Posner alludes to *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) in which the Court decided that "reasonable attorney's fee" within the meaning of § 1988 would permit the award of paralegal fees, even though paralegals are not attorneys. He also alludes to the many cases in which awards were authorized pursuant to that statute for lawyers' out-of-pocket expenses of travel, investigation, and other trial preparation. The Court then wrote, in response to one of the various arguments in opposition to the award of expert witness fees:

The defendants argue that a paralegal is more like an attorney than is an economist, a psychiatrist, a police commissioner (one of the experts here), or a sociologist (the other—William Whyte of *Organization Man* fame). That may be, but it does not touch the question whether the fee statute is to be read literally. A sheep is more like a goat than it is like an ostrich; but if a statute regulating sheep had been applied to goats, an attempted application to ostriches could not be defeated simply by pointing out that an ostrich is not a sheep. If "attorney" in the fee statute can mean something different from attorney, and "fee" something different from fee, then maybe one of the other things "attorney's fee" can mean is the fee paid an expert witness or consultant.

888 F.2d at 513.

After provocative discussion of the legal fictions embraced by the caption "Canons of Construction," Judge Posner continued:

The question what a statute means is only in part a function of what the legislators thought it meant. The scope of legislation is not circumscribed by the conscious thoughts of the legislators. Nor does the answer to an interpretive question turn on how the statute might be read by someone utterly ignorant of its background or by the same someone reading with the same literalism statements in the legislative history. "Clarity depends on context, which legislative history may illuminate." *In re Sinclair,* 870 F.2d 1340, 1342[ (7th Cir.1989) ]. We ask what meaning would be obvious to one familiar with the circumstances of enactment, including, here, the judicial history that provides the backdrop of the statute. We ask whether we can be confident that if someone had told Congress in the deliberations leading up to enactment that it had neglected to say anything about the shifting of expert-witness fees, Congress would have added language making clear to the most literal-minded that such fees could be shifted. We think it would have, and one reason is simply that we are given and can think of no reason against such shifting—espe-

cially given our earlier point that expert fees for advice and consultation can be shifted along with paralegal and other incidental expenses normally incurred in litigation.

\* \* \* \* \* \*

It had long been understood that when expenses of litigation were shifted pursuant to the equity powers of the district court, the statutes providing for the taxing of "costs," such as section 1920 (which in turn incorporates by reference the limitations on witness fees in section 1821), did not apply. *See, e.g., Henkel v. Chicago, St. Paul, Minneapolis & Omaha Ry.*, 284 U.S. 444, 447–48, 52 S.Ct. 223, 225, 76 L.Ed. 386 (1932). So when Congress restored the equitable power to shift litigation expenses in civil rights cases, it took the question of expert-witness fees in such cases out of 28 U.S.C. §§ 1821 and 1920. No doubt it would be unrealistic to suppose that Congress actually considered the bearing of *Henkel* and like cases. But it is only on an assumption of omniscience that the failure to specify expert-witness fees becomes significant, for while an omniscient Congress would remember sections 1821 and 1920, equally it would remember *Henkel*. To assume omniscience not only is unrealistic, but leads nowhere. 888 F.2d at 518–19.

In unhesitatingly approving the award of expert witness fees, I am sensitive to the fact that this precise issue will in the near future be resolved by the United States Supreme Court when it decides *West Virginia University Hospitals, Inc. v. Casey, supra.* In that regard, in a dissenting opinion in *Spector Motor Service v. Walsh*, 139 F.2d 809 (2d Cir.1944), Judge Learned Hand observed, at p. 823, that it is undesirable

for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that the measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before us.

In faithfulness to that teaching, in divining what the Court will decide in *West Virginia University Hospitals*, I merely discharge my duty and plaintiffs' application for expert witness fees is granted.

### V. *Summary*

The award of fees and costs to plaintiffs will be calculated as follows:

| Attorney | Hours | Rate | Lodestar | |
|---|---|---|---|---|
| R. Bellman | 1889.33 | $225/hr. | $425,099.25 | |
| L. Steel | 160.33 | $225/hr. | 36,074.25 | |
| M. Clark | 169.92 | $135/hr. | 22,939.20 | |
| G. Novendstern | 35.17 | $135/hr. | 4,747.95 | |
| C. Sanders [1] | 105.00 | $135/hr. | 14,175.00 | |
| Total Case Fees | | | $503,035.65 | |
| × 1.75: | | | | $880,312.38 |
| | | | | |
| Counsel Fee Application | | | | |
| R. Bellman | 34.25 | $225/hr. | $ 7,706.25 | |
| L. Friedman | 38.40 | $225/hr. | 8,640.00 | |
| Total Application Fees | | | | 16,346.25 |
| Costs and Expert Fees | | | | 30,243.00 |
| Total Award | | | | $926,901.63 |

SO ORDERED.

1. Mr. Sanders is an attorney for the NAACP, who seeks reimbursement on behalf of the organization. His experience is comparable to that of the other associates.