Joseph DAVID, as administrator of the Estate of Irene David, and on behalf of all others similarly situated, and Salvatore Civillo, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Louis W. SULLIVAN, M.D., in his capacity as Secretary of Health and Human Services, and Group Health Incorporated, Defendants.

No. 79 Civ. 2813.

United States District Court,
E.D. New York.

Nov. 13, 1991.

Brown & Seymour by Whitney North Seymour, Jr., Toby Golick, Benjamin N. Cardozo Law School, New York City, for plaintiffs.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Bruce H. Nims, Asst. U.S. Atty., Brooklyn, N.Y., for defendants.

## MEMORANDUM, FINAL ORDER AND JUDGMENT

WEINSTEIN, District Judge:

After a full hearing of this matter by the court, the Magistrate Judge's recommendations and findings are adopted for the reasons stated in her Report which is attached to, and made a part of, this order.

Plaintiffs' counsel contend that the Magistrate Judge's award of fees is based on rates that are somewhat low by Manhattan standards. The fees awarded are adequate to encourage attorneys to take on the important task of policing government practices. Added to the monetary incentive is the supplemental psychic incentive of recognition for a job well done from the bar, bench, and public, and personal satisfaction for performing a valued public service. Able attorneys in metropolitan New York should be sufficiently beguiled by this package of benefits to continue to pursue public interest litigation of this kind.

This case is closed.

So ordered.

## REPORT AND RECOMMENDATION

ALLYNE R. ROSS, United States Magistrate Judge.

This action began over twelve years ago when plaintiffs—a class of Medicare beneficiaries who were enrolled in the supplementary medical insurance program established under Part B of the Social Security Act, 42 U.S.C. § 1395j et seq., but who had been denied reimbursement for certain medical costs—sued Group Health Incorporated (GHI), the carrier which administers the program in Queens, New York, and the Secretary of Health and Human Services (HHS), who is statutorily authorized to contract with private insurance carriers to administer the Part B claims process. Plaintiffs alleged, in substance, that the "review determination notices," through which GHI supposedly informed plaintiffs of the results of the carrier's internal review of its decision to deny benefits, were inadequate. Although Judge Weinstein resolved the primary issue in 1984, ruling that these notices did not meet due process standards and ordering that they be "changed to provide claimants with comprehensible explanations of the actual reason full reimbursement is denied," David v. Heckler, 591 F.Supp. 1033, 1035 (E.D.N.Y.1984), there have been many subsequent proceedings in which details concerning this original order have been ironed out. In June 1990, plaintiffs moved, pursuant 28 U.S.C. § 2412, to recover the attorneys' fees and costs they incurred during these post-judgment proceedings. After rendering a decision as to certain aspects of this motion, Judge Weinstein referred this matter to me for a report and recommendation concerning all aspects of the fees request.

## FACTS

### The Procedural History

This class action, brought by plaintiffs' counsel on behalf of "hundreds of thousands of older people in Queens, New York, whose Medicare Part B claims [were] subjected to diminution," principally challenged the adequacy of notices and appeal procedures used by GHI, the insurance carrier who was authorized by HHS to administer the Part B claims process in this area. David v. Heckler, 591 F.Supp. at 1035. The dispute focused on the adequacy of GHI's "review determination notices" (also referred to as "review letters"), which are sent to beneficiaries who challenge GHI's refusal to reimburse them for certain medical costs in order to inform them of the results of GHI's internal review of its initial decision to deny benefits. This dispute was largely resolved following a 1984 bench trial before Judge Weinstein; in David v. Heckler, 591 F.Supp. 1033, the judge ruled that the review determination notices were "constitutionally inadequate"

in that they were "incomprehensible to most of the people who receive them" and did "not contain enough information about why reimbursement was denied and how the reimbursable amount was calculated to enable an individual or his or her representative to effectively appeal the decision." *Id.* at 1042. The judge also found that this lack of information pervaded all aspects of the review process, including the hearing stage, thereby presenting a due process problem which mandated certain modifications in procedures. *Id.* at 1046–47.

To cure these deficiencies, Judge Weinstein ordered, *inter alia*, that defendants re-draft the review letters so as to 1) eliminate code words and confusing language and 2) insure that they were sufficiently clear and detailed so that beneficiaries could determine whether or not their reimbursement had been calculated correctly. The judge also directed defendants to furnish plaintiffs' counsel with information necessary to ensure that the Plan B program was being properly administered. In so doing, the court praised plaintiffs' counsel efforts, noting that plaintiffs might otherwise not be represented because 1) the relatively small claims made it uneconomical for them to obtain counsel, 2) no specialized bar, such as that which has developed to effectively protect the rights of Social Security recipients, was likely to develop to protect Medicare beneficiaries, and 3) it was difficult for the elderly to organize effective private organizations with the interest and resources necessary to provide a check on the system. Judge Weinstein stated:

> [O]ne organization has shown the interest and capacity necessary to investigate [Medicare violations] and obtain relief—Legal Services for the Elderly. In this case the organization provided highly skilled and aggressive representation for the class through Toby Golick, Esq. in conjunction with Julia Spring Esq. and Whitney North Seymour, Esq., acting pro bono in the highest traditions of the bar. *Id.* at 1048.

Following this decision, plaintiffs moved for an award of attorneys' fees. This motion was withdrawn in May, 1985, however, after the parties reached an agreement on this issue. Their agreement was embodied in a stipulation, entered as an order by Judge Weinstein on May 17, 1985, which provided that plaintiffs would accept $74,-500 "in full settlement and discharge of their claim for attorneys' fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412." The motion at bar, therefore, does not seek to recover attorneys' fees or costs related to the trial or pre-trial proceedings, but only to recover expenses relating to post-judgment proceedings which took place in 1987 and thereafter.

Plaintiffs initiated these post-judgment proceedings on April 2, 1987, by moving that defendants be held in contempt for failure to comply with the Court's original July 11, 1984, ruling. Plaintiffs alleged, *inter alia*, that GHI had failed to simplify the review determination notices, but that HHS's annual reviews had nonetheless found the carrier in perfect compliance with the 1984 order. While Judge Weinstein denied this motion, he directed defendants to produce the review determination letters and other data analyzed during the government's Fiscal Year (FY) 1985 and 1986 reviews.

Although the government subsequently provided plaintiffs' counsel with copies of "scoring sheets" and summaries prepared by the reviewers who evaluated GHI's performance, it could not produce the specific letters analyzed during the FY 1985 review because these were not adequately identified in the reviewer's records. Plaintiffs' counsel thereupon requested that the government repeat its FY 1985 and 1986 reviews using a new random sampling of letters, and that plaintiffs' representatives be permitted to witness the review of these letters. The government denied this request.

On July 21, 1987, plaintiffs filed a second post-judgment motion, seeking to compel production of the letters analyzed during the FY 1985 and 1986 reviews. At the September 23, 1987 oral argument on this motion, Judge Weinstein ruled that no pur-

pose would be served in repeating prior reviews, but ordered defendants to supply plaintiffs, *inter alia*, with copies of the 60 randomly-selected review determination notices which were reviewed as part of the FY 1987 audit.

On March 18, 1988, based on an extensive review of the letters produced by defendants, plaintiffs renewed their original motion to hold defendants in contempt, asserting that the notices produced were lacking in substantive content and thus failed to comply with the court's original ruling. At the June 27, 1988 oral argument on this motion, Judge Weinstein declined to entertain the contempt question and essentially converted the motion into a request for modification of the original decree. He then ordered defendants, *inter alia*, to make several alterations on the notices being used and directed the parties to develop a proposal for a system that would provide the beneficiaries with sufficient information to challenge agency determinations.

Over the next few months, plaintiffs' counsel invested substantial effort in developing a proposal for amending the Medicare Part B reimbursement review determination procedure. During this time, the parties appeared before Judge Weinstein in several proceedings pertaining to this proposal, including a September 1988 hearing at which plaintiffs adduced testimony concerning the operation and costs of the proposed system.

These efforts culminated in an Interim Order, signed by Judge Weinstein on December 21, 1988. This order denied plaintiffs' civil contempt motion, with leave to renew, but noted that "[t]he apparent failure of the defendants' actions to rectify prior defects in notice and to fully comply with directions of this Court in the Judgment previously entered necessitate[d] a more precise order to ensure adequate compliance...." The court then directed GHI to implement, for a six-month period, the proposal upon which the parties had agreed and to prepare a written report detailing the results of this test.

On June 29, 1990, following the completion of the six-month test, plaintiffs moved for a final order compelling adoption of the proposed, and recently tested, system. This motion included a request, pursuant to 28 U.S.C. § 2412, for the attorneys' fees that plaintiffs incurred as a result of the post-judgment proceedings. Defendants opposed this fee request, arguing that the plaintiffs had failed to establish, as required by statute, that they were the "prevailing party," or to submit contemporaneous time records. Plaintiffs' counsel replied to the latter argument in a Declaration of Services, dated September 4, 1990, which specified, for each attorney, the dates on which they performed certain work and the hours they expended on these tasks. In addition, this affidavit argued that plaintiffs' counsel should be permitted to recover at market rates, ranging from $350 to $275, because the government had acted in bad faith.

On September 5, 1990, Judge Weinstein entered a final order, directing defendants to comply with all terms of the original Judgment of July 11, 1984 and the Order of January 11, 1985, as set forth in the Interim Order of December 21, 1988. In the course of these proceedings, the judge rebuffed plaintiffs' suggestions that defense counsel's conduct had been improper, stating "the Government's attorneys have handled this [matter] in a perfectly responsible and straightforward way." Transcript of September 5, 1990 Proceedings, p. 7. While the judge conceded that "[t]here ha[d] been stonewalling on the part of the agency," he added, "[t]here almost always is [stonewalling] in these cases." *Id.* at p. 8.

The judge also ruled on some aspects of the fee request. First, he found that plaintiffs were the prevailing party in the original trial, which resulted in the July 1984 judgment, and in the subsequent contempt proceedings, which had resulted in the final order which had been signed that day. *Id.* at pp. 23–25. In so ruling, the judge rejected the defense claim that the contempt motions had been unnecessary, stating that he felt it was "appropriate under the circumstances for the plaintiffs to come in

and seek further relief"; that "plaintiffs operated in a straightforward and responsible way"; and that there was no "attempt at protracted litigation." *Id.*, pp. 25–26.

While Judge Weinstein also stated that he was "prepared to approve" plaintiffs' request for attorneys' fees and opined that plaintiffs' request for up to $350 an hour in fees seemed reasonable, he ultimately referred this case to me for a report on fees. The judge originally envisioned a report on whether the hourly rates requested and the numbers of hours for which plaintiffs' counsel sought compensation were reasonable. When plaintiffs' counsel pressed for a definitive ruling as to whether the government's conduct was so unreasonable as to permit recovery at market rates, however, the judge requested a full exploration of the fees issue.

Subsequent to this referral, both parties have submitted papers pertaining to the fees issues. Plaintiffs seek to recover attorneys' fees from the government pursuant to both subsections (b) and (d) of 28 U.S.C. § 2412, which were enacted in 1980 as part of the Equal Access to Justice Act (EAJA). First, plaintiffs seek to fit this case within subsection (b)—which subjects the federal government and its agents to the common law and statutory exceptions to the "American rule" (requiring that each party pay its own attorneys' fees)—claiming that the government acted in bad faith and should be liable for plaintiffs' attorneys' fees under the common law "bad faith exception." Alternatively, plaintiffs seek damages under subsection (d), which provides that a prevailing party in a civil action brought against the United States may recover its "fees and other expenses" from the government "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Recognizing that the term "fees and other expenses," as defined in this subsection, restricts attorneys' fees to "$75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the

proceedings involved, justifies a higher fee," 28 U.S.C. § 2412(d)(2)(A)(ii), plaintiffs argue both that the government's position was not substantially justified and that a "special factor" exists which justifies awarding fees at market rate.

Defense counsel not only controvert plaintiffs' arguments on the bad faith, substantial justification and special factor issues, but also assert that attorneys' fees should not be awarded for other reasons. First, defendants argue that the May 17, 1985 stipulation, in which plaintiffs agreed to accept $74,500 in "full settlement and discharge of their claim for attorneys' fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412," unambiguously precludes plaintiffs' current motion for fees. Second, defendants contend that, pursuant to *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir.1983), this court should decline to award fees unless plaintiffs can produce contemporaneous time records.

The issues raised in the parties' papers are set forth in detail in the discussion below.

## DISCUSSION

### *The Effect of the April 1985 Stipulation*

■ Defendants initially argue that the terms of an April 2, 1985 stipulation, which embodied the settlement of plaintiffs' initial motion to recover fees incurred before and during the trial, precludes this court from awarding attorneys' fees upon the instant motion. Asserting that the principles governing the construction of contracts are applicable to stipulations, which they characterize as binding contracts between the parties, defendants argue that this court should enforce the unambiguous terms of the stipulation and should not consider extrinsic evidence. Defendants argue that the stipulation's terms, under which plaintiffs agree to accept $74,500 "in full settlement and discharge of their claim for attorneys' fees and expenses under the Equal Access to Justice Act," unambiguously precludes the plaintiffs from seeking additional fees under the EAJA. Plain-

tiffs, however, contend that the stipulation merely settled plaintiffs' claim for attorneys' fees incurred during the trial phase of the litigation, noting that post-judgment proceedings were not even contemplated at the time the stipulation was signed.

Even accepting, *arguendo*, defendants' contention that this court should enforce the unambiguous terms of the stipulation, I cannot concur with their assertion that the stipulation unambiguously bars this action. To the contrary, the language of the stipulation clearly provides that plaintiffs were to receive $74,500 to settle their *pending* claim for attorneys' fees and expenses— *i.e.*, the claim for fees and expenses incurred before and during trial. Neither the terms of the stipulation nor any extrinsic evidence suggests that this document was intended to have a preclusive effect on subsequent claims seeking to recover attorneys' fees incurred years after the stipulation.

*Plaintiffs' Claim that the Defendants Acted in "Bad Faith"*

■ In the papers filed prior to the September 5, 1990 oral argument and at the argument itself, plaintiffs sought to recover "market rate" attorneys' fees under the "bad faith exception" to the American Rule—one of the "common law exceptions" to which the government is subjected by operation of 28 U.S.C. § 2412(b). Plaintiffs contend that defendants have "thumbed their noses" at Judge Weinstein's July 1984 order; they assert that HHS did nothing more than revise some pages in its Medicare Carriers Manual, then deliberately overlooked GHI's disregard of these changes. Defendants, who characterize plaintiffs' contempt motions as frivolous, respond by arguing that plaintiffs' evidence falls far short of the "extraordinary showing" required to invoke the bad faith exception.

■ An award of attorneys' fees under the bad faith exception is punitive and is to be granted "only in exceptional cases and for dominating reasons of justice." *Barry v. Bowen*, 825 F.2d 1324, 1333 (9th Cir.1987), quoting other Ninth Circuit authority quoting 6 J. Moore, *Moore's Feder-*

*al Practice,* ¶ 54.77[2] (2d ed. 1972). The Second Circuit has held that "an award of fees under the bad faith exception is warranted when 'the losing party's claims were "entirely without color and made for reasons of harassment or delay or for other improper purposes." ' " *Wells v. Bowen*, 855 F.2d 37, 46 (2d Cir.1988), *quoting Sierra Club v. United States Army Corps of Engineers*, 776 F.2d 383, 390 (2d Cir.1985), *cert. denied sub nom. New York State Dept. of Transp. v. Sierra Club*, 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986), *quoting Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir.1977). While the requisite bad faith may be found in the actions which led to the litigation, as well as in the conduct of the litigation itself, *Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973), the plaintiff bears the burden in either event of establishing both meritlessness and improper purpose. *See Barry v. Bowen*, 825 F.2d at 1333; *Wells v. Bowen*, 855 F.2d at 46.

Plaintiffs in this case have failed to establish an improper purpose underlying either the government actions—or inaction— which prompted the contempt motions or defense counsel's conduct during those motions. Indeed, at the September 5, 1990 oral argument, Judge Weinstein himself discounted suggestions that government attorneys' had acted improperly, opining, on the basis of the information before him, that defense counsel had handled the post-judgment proceedings "in a perfectly responsible and straightforward way." Moreover, while the judge also noted that "[t]here ha[d] been stonewalling on the part of the agency," he declined to hold the government in contempt of his July 1984 order. His subsequent observation that "[t]here almost always is [stonewalling] in these cases" suggests that the government's inaction was due to bureaucratic inertia rather than any improper purpose. Since plaintiffs' papers do not contain additional, convincing evidence of defendants' bad faith, the bad faith exception should not be applied in this case.

*Plaintiffs' Claim for Market Rate Fees under § 2412(d)*

Following the September 5, 1990 oral argument, plaintiffs advanced, for the first time, an argument for recovering market rate fees under § 2412(d). In order to recover market rates under this theory, however, plaintiffs must establish 1) that the government's position was not "substantially justified" and 2) that there exists a "special factor" that justifies an hourly rate in excess of $75 per hour.

*The Question of Substantial Justification*

■ The EAJA was enacted, in part, to ensure that litigants would "not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved in securing the vindication of their rights." House Report No. 99–120, Part 1, p. 4, *reprinted in* 1985 U.S.Code Cong. & Admin.News, pp. 132–33. Subsection (d) effectuates this purpose by providing that, "unless the court finds that the position of the United States was substantially justified," parties which prevail in civil actions brought by or against the United States government shall be awarded "fees and other expenses" incurred during the action. 28 U.S.C. § 2412(d)(1)(A).

The Second Circuit has long interpreted the term, "substantially justified," as essentially imposing a standard of reasonableness. *Cohen v. Bowen*, 837 F.2d 582, 586 (2d Cir.1988), *citing Environmental Defense Fund, Inc. v. Watt*, 722 F.2d 1081, 1085 (2d Cir.1983), and *Sierra Club v. United States Army Corps of Engineers*, 776 F.2d at 393. This interpretation—shared by every other circuit except the District of Columbia—was essentially adopted in *Pierce v. Underwood*, 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), which defined the term to mean "justified to a degree that could satisfy a reasonable person." *Id.*, 108 S.Ct. at 2550.

■ Although defendants quote Judge Weinstein's statement that defense counsel handled this litigation in "a perfectly responsible and straightforward way" and argue that the government's positions in this action have always been reasonable,

these arguments inappropriately focus on the government's conduct in court rather than the conduct which gave rise to the post-judgment motions in the first place. The purpose behind subsection (d) is to prevent litigation expenses from deterring those who would otherwise seek review of unjustified government actions; accordingly, the focus of the inquiry in this case should be the government's efforts to comply with Judge Weinstein's July 1984 order.

In this case, I cannot find that the government's actions in this case were "substantially justified," since the government failed to effect independently the changes in procedure which were mandated by the court's July 1984 judgment. The interim order, signed by Judge Weinstein on December 21, 1988, stated that "[t]he apparent failure of the defendants' actions to rectify prior defects in notice and to fully comply with directions of this Court in the Judgment previously entered necessitate[d] a more precise order to ensure adequate compliance...." Moreover, in entering the final order, the judge expressly rejected the defense claim that plaintiffs' contempt motions had been unnecessary, stating that it was "appropriate under the circumstances for the plaintiffs to come in and seek further relief." Since the government's inaction necessitated the post-judgment proceedings for which plaintiffs now seek attorneys' fees, the purpose underlying the EAJA dictates that plaintiffs be permitted to recover "fees and other expenses" under subsection (b).

*The Question of Special Factors*

■ The "fees and other expenses" which plaintiffs may recover under subsection (b), however, are ordinarily limited to $75 per hour by operation of 28 U.S.C. § 2414(d)(2)(A). This provision defines the term "fees and other expenses" to include "reasonable attorneys fees," but dictates that "attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). Thus,

in order to recover at rates above $75 per hour, plaintiffs must establish that a "special factor" exists.

As recently as 1988, the Supreme Court addressed the question of what constitutes a "special factor" for purposes of this statute specifically considering the example suggested by Congress—a "limited availability of qualified attorneys for the proceedings involved." In *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, the Court ruled that Congress had not meant to communicate, through this example, that the $75 cap should be lifted whenever "lawyers skilled and experienced enough to try the case [were] in short supply." Recognizing that such an interpretation would eviscerate the $75 cap by defining "special factor" in terms of the supply considerations driving market rates, the Court interpreted the Congressional language narrowly, stating:

> [T]he exception for "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question—as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language. Where such qualifications are necessary and can be obtained only at rates in excess of the $75 cap, reimbursement above that limit is allowed. *Id.,* 108 S.Ct. at 2554.

In urging that a "special factor" exists in this case, plaintiffs primarily seek to analogize this case to *Pirus v. Bowen,* 869 F.2d 536 (9th Cir.1989). In that case, a district court had permitted recovery in excess of the $75 cap by attorneys who had represented the plaintiff class in an action involving the "widow's insurance" provisions of the Social Security Act and who had previously taken a similar class action all the way to the Supreme Court. Although the district court's decision preceded the Supreme Court's 1988 opinion in *Underwood,* the Ninth Circuit upheld the lower court's ruling as "based on the same kind of factors as the *Underwood* court identified." *Id.* at 542. First, the Ninth Circuit found that plaintiffs' counsel had "distinctive knowledge or specialized skill" in social security law, having developed expertise and skills which were "in many ways akin to those developed by a patent lawyer: expertise with a complex statutory scheme; familiarity and credibility with a particular agency; and understanding of the needs of a particular class of clients ... and of how those needs could best be met under the existing statute and regulations." Second, the circuit court found that the attorneys' special expertise was necessary because "the litigation involved a highly complex area of the Social Security Act, with which plaintiffs' attorneys had already developed familiarity and expertise." Third, the Ninth Circuit concluded that the requisite skills could not be obtained elsewhere at the statutory rate, relying on the district court's determination "that there were no lawyers in the Los Angeles area besides Pirus' attorneys who possessed the skills necessary ... and who would take the case for $75 an hour." *Id.*

Defendants seek to distinguish this case from *Pirus* on at least two grounds. First, defendants suggest that *Pirus* is somehow distinguishable by virtue of "the unusual and seemingly persuasive circumstance that plaintiff's attorneys had litigated a virtually identical case all the way to the Supreme Court and, arguably had unique experience with litigation concerning one discrete aspect of widow's insurance benefits." AUSA Nims' letter of July 24, 1991, p. 3. Second, they argue that the skills provided by plaintiffs' counsel in this case are readily available at the $75 rate in New York City, requesting that this court take judicial notice of the "quite numerous" class actions challenging HHS regulations and procedures which have been brought here and in the Southern District of New York by public interest law organizations.

These efforts to distinguish *Pirus* are not only unpersuasive, but—in the case of

defendants' first argument—actually highlight the similarities between that case and this. First, it appears uncontroverted that plaintiffs' attorneys have "distinctive knowledge or specialized skill" in medicare cases, having developed expertise with a complex statutory scheme, a familiarity with an agency, and an understanding of the needs of the elderly which is similar to that developed by the social security practitioners in *Pirus*. Second, while counsel in *Pirus* had previously litigated a virtually identical case involving the same issue, plaintiffs' attorneys in this case had previously argued the exact same case at trial—an experience which afforded them the unique familiarity with its procedural history and the knowledge of legal issues which was essential to the post-judgment proceedings. Third, defendants' claim that many other public interest organizations might have originally brought this action is undercut by Judge Weinstein's observation that only "one organization ... show[ed] the interest and capacity necessary to investigate and obtain relief." *David v. Heckler*, 591 F.Supp. at 1048. Moreover, even assuming that other organizations are now available to bring a similar action, plaintiffs' counsel were nonetheless uniquely suited to handle the post-judgment proceedings in this action efficiently in light of the highly-specialized legal and factual knowledge necessary to undertake them. Accordingly, I conclude that here, as in *Pirus*, plaintiffs have established there was a "limited availability of qualified attorneys for the proceedings involved"—a "special factor" which justifies the recovery of reasonable attorneys' fees in excess of $75 per hour.

*The Reasonableness of Plaintiffs' Fee Requests*

▮ While the determination that a "special factor" exists permits attorneys' fee awards in excess of the $75 cap, this does not entitle plaintiffs to recover fees at market rates, but to recover "reasonable attorneys fees." "What fee is reasonable is determined by 'the prevailing market rates in the relevant community' for 'similar services by lawyers of reasonable skill, experience and reputation.'" *Huntington*

*Branch NAACP v. Town of Huntington*, 749 F.Supp. 62, 64 (E.D.N.Y.1990), *quoting Blum v. Stenson*, 465 U.S. 886, 895–96 & n. 11, 104 S.Ct. 1541, 1547–48 & n. 11, 79 L.Ed.2d 891 (1984). The "relevant community" is the district in which the district court sits, unless a showing is made that special expertise of counsel from a distant district was required. *Huntington Branch NAACP v. Town of Huntington*, 749 F.Supp. at 64, *citing Polk v. New York State Dept. of Correctional Services*, 722 F.2d 23, 25 (2d Cir.1983). The amount to be awarded, however, is not "the highest rate which the attorneys can earn, but such rate as will provide 'reasonable payment for the time and effort expended.'" *Huntington Branch NAACP v. Town of Huntington*, 749 F.Supp. at 65, *quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 726, 107 S.Ct. 3078, 3087, 97 L.Ed.2d 585 (1987).

▮ Although plaintiffs have not cited any instances in which recovery in excess of $250 has been permitted by court in this district, they request that the four attorneys who represented them in this matter be compensated at rates ranging from $350 to $275 per hour. First, they request that Whitney North Seymour, Jr.—a named partner in a Manhattan law firm and a former U.S. Attorney for the Southern District of New York, who has handled many cases involving Medicare issues—be awarded $350 per hour, the rate he charges private clients. Second, they seek $275 per hour for the services of Toby Golick, a clinical professor at Cardozo Law School, and Julia Spring, an associate clinical professor at Columbia Law School—both of whom have considerable experience in this area of law. Third, plaintiffs also seek $275 per hour for the services of Craig Landy—who appears to have practiced in this area for five or six years and to be associated with Mr. Seymour's firm. While there is no doubt as to the high quality of these attorneys, whom Judge Weinstein commended for providing "highly skilled and aggressive representation," *David v. Heckler*, 591 F.Supp. at 1048, I concluded that the requested rates are excessive.

In his October 1990 opinion in *Huntington Branch NAACP v. Town of Huntington*, 749 F.Supp. 62, Judge Glasser surveyed recent attorneys' fees cases in this district and concluded that lead attorneys have rarely, if ever, been awarded fees in excess of $250 per hour. *Id.* at 64. Moreover, in discussing the only case he cited in which $250 was recovered—*Palermo v. Board of Educ.*, No. CV–87–2960 (E.D.N.Y. April 3, 1989) (available on Westlaw at 1989 WL 35938)—Judge Glasser was careful to note that the $250 rate applied only to 18 hours logged by a senior partner; the remainder of the over 200 hours expended in the litigation was logged by associates who were compensated at the much lower rate of $125 per hour. *Id.* at 64–65. Judge Glasser did not conduct a similar analysis of the rates awarded associates, but cited to a February 1990 survey by the *Suffolk Lawyer* which concluded that associates earned $100 to $150 per hour.

In light of Judge Glasser's findings and the skill, experience and reputation of Mr. Seymour, I conclude that $250 per hour is reasonable compensation for his services. Since there is nothing to suggest that Ms. Golick is any less skilled in this area than Mr. Seymour, she too should receive $250 per hour. Indeed, this is the precise amount Ms. Golick was awarded in a recent social security case in the Southern District of New York. *Hinton v. Sullivan*, slip op. at 14, No. 84 Civ. 9276 (CES), 1991 WL 123960 (S.D.N.Y. July 2, 1991) (available on Westlaw at 1991 WL 123960). Ms. Spring, who was an associate professor at the time of the post-judgment proceedings, appears slightly less experienced than Ms. Golick and should be reasonably compensated by $200 per hour. Finally, Mr. Landy, who appears to perform the duties of a senior associate at Mr. Seymour's office, should receive $150.

*The Effects of the Failure to Produce Contemporaneous Time Records*

■ A final issue must be resolved prior to determining the hours expended by plaintiffs' counsel and calculating the award: defendants' claim that plaintiffs have failed to produce contemporaneous time records—a prerequisite for recovering attorneys' fees in this Circuit. Plaintiffs' counsel have submitted typewritten records, which they refer to as "transcriptions of contemporaneous time records," Plaintiffs' Reply Memorandum, p. 11, and which indicate, for each attorney, the dates on which they performed certain work and the hours they expended on these tasks. Defendants, however, allege that these do not constitute the requisite contemporaneous time records in that they are not the original records, asserting that the production of the "actual time records" is "particularly necessary" here for two reasons. First, they allege that the documents contain "numerous inaccuracies," but identify only one supposed error: entries alleging that, in April 1987, Ms. Golick and Ms. Spring labored three and two hours, respectively, to assist in preparation of a contempt motion which was filed on April 1, 1987. Second, defendants complain that many of the entries are insufficiently specific in that they give a range of dates over which certain work was accomplished. Defendants request that this court either refrain from awarding any fees until these records are produced or reduce the compensable hours by the time it took to prepare this fees application.

■ In *New York Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, the Second Circuit ruled:

> [A]ny attorney—whether a private practitioner or an employee of a nonprofit law office—who applies for court-ordered compensation in this Circuit for work done after the date of this opinion must document the application with contemporaneous time records. These records should specify, for each attorney, the date, the hours expended, and the nature of the work done. *Id.* at 1148.

The reasoning behind this rule is that "courts should not be faced with an impossible chore when making fee determinations, and that lawyers should not be required to expend even more hours reconstructing the past in assembling fee applications." *Carrero v. New York City*

*Housing Authority,* 685 F.Supp. 904, 909 (S.D.N.Y.1988), *aff'd,* 890 F.2d 569 (2d Cir. 1989). Attorney affidavits which set forth all charges with the required specificity but which are reconstructions of the contemporaneous records satisfy the rationale underlying *Carey* and suffice to permit recovery of attorneys' fees. *See Carrero v. New York City Housing Authority,* 685 F.Supp. 904; *Johnson v. Kay,* 742 F.Supp. 822, 837 (S.D.N.Y.1990). In such cases, however, courts frequently deny fees for the time spent preparing the fee application as "an appropriate and necessary penalty for omitting to include the time records." *Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986), *see Carrero v. New York City Housing Authority,* 685 F.Supp. at 909; *Johnson v. Kay,* 742 F.Supp. at 837.

Where the records submitted are merely typewritten transcriptions of the original handwritten time sheets filled out by the attorneys, on the other hand, these have been treated as contemporaneous records and no such penalty has been imposed. *Lenihan v. City of New York,* 640 F.Supp. 822 (S.D.N.Y.1986). As the *Lenihan* court noted, these records are essentially identical to the familiar computerized transcriptions of the billing records which most large law firms now store in computers. *Id.* at 824. The court implicitly recognized that it would make no sense to penalize a party for attempting to present the contemporaneous records in a form convenient to the court.

In this case, plaintiffs' counsel claim that the typewritten records which they have appended to their September 4, 1990 "Declaration of Services" are "transcriptions of contemporaneous time records." Defendants have not suggested any reason to question plaintiffs' claim. Moreover, since defendants have not adduced any convincing evidence that these transcriptions are inaccurate, I see no reason to examine the original time slips. Although it is clear that the records were transcribed in a manner that consolidated certain entries—*e.g.,* stating that Ms. Golick spent 3.5 hours reviewing a government memorandum and preparing a reply declaration sometime between September 1 and 11, 1987—rather than specifying the precise dates on which the work took place and leaving it to this court to perform its own calculations, the purpose underlying the *Carey* requirement would certainly not be served by penalizing plaintiffs for attempting to present the contemporaneous records in a form convenient to the court.

*The Calculation of the Fees*

With all the substantive issues in this case resolved, all that remains to be done is the arithmetic. I have reviewed plaintiffs' counsel's time records and conclude that the hours requested appear reasonable in light of the tasks on which the hours were expended. Accordingly, I recommend that attorneys' fees be awarded as follows:

| Attorney | Hours | Rate | Total |
| --- | --- | --- | --- |
| Mr. Seymour | 98.5 | $250 | $24,625 |
| Ms. Golick | 82.35 | $250 | $20,587.50 |
| Ms. Spring | 19.95 | $200 | $ 3,990. |
| Mr. Landy | 101.66 | $150 | $15,249. |

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.Pro. 6(a), 6(e);

*Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989).